# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00798-COA

**LUAN TRONG MAI A/K/A LUAN MAI A/K/A JOHN MAI**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                                 **APPELLEE**

DATE OF JUDGMENT:                  06/21/2022
TRIAL JUDGE:                             HON. STEVE S. RATCLIFF III
COURT FROM WHICH APPEALED:   RANKIN COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:       JOHN M. COLETTE
                                             SHERWOOD ALEXANDER COLETTE
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
                                             BY: ASHLEY LAUREN SULSER
DISTRICT ATTORNEY:                 JOHN K. BRAMLETT JR.
NATURE OF THE CASE:               CRIMINAL - FELONY
DISPOSITION:                          AFFIRMED - 04/23/2024
MOTION FOR REHEARING FILED:

### BEFORE BARNES, C.J., GREENLEE AND McCARTY, JJ.

### BARNES, C.J., FOR THE COURT:

¶1.     A Rankin County Circuit Court jury found Luan Trong Mai guilty of fondling a child, and the trial court sentenced him to serve fifteen years in the custody of the Mississippi Department of Corrections. After the trial court denied Mai's posttrial motions, he appealed. Finding no error, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2.     In 2000, Mai and his wife Jenny moved from Vietnam to the United States.[1] As of

---

[1] The family initially lived in California but moved to Mississippi approximately ten years later.

2020, the couple had four children: "Betty" (age 25); Luan Mai Jr. (a/k/a David) (age 22); "Karen" (age 16); and "Khloe" (age 7).[2]

¶3.     On May 11, 2020, Karen sneaked out of the house to have sex with her boyfriend. When her parents and her older sister found out a few days later, they called the Flowood Police Department to file a report.[3]  Before the police arrived, Mai met with Karen in her room and locked the door.  According to Karen, Mai told her he "wanted to check [her] to see if [she] was bleeding in any way."  Karen told her father "no repeatedly."  When Mai "made a motion to hit [her]," Karen "flinched," and Mai "pushed [her] down on the bed and pulled [her] pants down. . . . [H]e held [her] down with one hand and used the other hand to put a finger in" her vagina, and "twirled his finger around."  After Mai "put his finger inside [Karen's] vagina," he rubbed his hands "a little bit up on the higher thigh."  Mai stopped touching her when her "mom came and knocked—tried to open the door."  Mai threw his daughter's pants at her and told her to dress quickly because they would "get in trouble" if her mother saw what was going on.  When the police arrived to question her, however, Karen said nothing about the incident with her father because Mai had threatened her.

¶4.     On August 1, 2020, Betty summoned the police to the Mai residence to resolve a heated domestic argument amongst the family.  After the police left, Karen told her older sister about the previous incident on May 14, 2020.  Betty filed a police report against her father a couple of days later.  Mai was arrested and indicted for sexual battery of a minor, *see*

---

[2] We use pseudonyms to protect the privacy of all minors or victims involved.

[3] Karen explained at trial that her parents thought her boyfriend "was older."

Miss. Code Ann. § 97-3-95 (Rev. 2014), and fondling of a child (for gratification of lust), *see* Miss. Code Ann. § 97-5-23(2) (Supp. 2015).

¶5. Before trial, the State noticed its intent to elicit testimony and evidence from Karen and Betty under Mississippi Rule of Evidence 404(b) "about additional sexual acts committed by [Mai] against the victim and others while they were minors." The State argued during the pre-trial motions hearing that this evidence was relevant because it showed Mai's "[m]otive, opportunity, intent, preparation, and plan." Defense counsel objected, and the trial court held an evidentiary hearing.

¶6. Karen testified about what Mai had done to her. When she was six years old, her father grabbed her and rubbed her "private area" over her clothes. Two years later, when Karen was home sick with a cold, Mai "forced" her to let him rub "hot ice rub" on her bare chest and "groped" her. When Karen was nine years old, her older sister and mother left for work; so Karen was asked to look after her infant sister. Mai, who "wasn't dressed yet," came by and "tried putting his hands down [her] pants." She pushed his hand away a couple of times and threatened to scream; so he finally left. Mai would also make inappropriate remarks about her body, saying that she "need[ed] to get a bigger butt and that [her] boobs were too small." Karen testified that she could not "keep count" of the times her father would walk by her and rub against her, touching her "backside." The State argued that these prior incidents were "admissible to show [Mai's] lustful, lascivious disposition toward this particular victim[.]" Defense counsel argued that the incidents with Karen were "too remote" and that the victim was "coached and tainted." The trial court judge ruled to allow Karen's

3

testimony at trial, as it was "relevant" and "would show as the State intends to prove motive or introduce it for the motive, opportunity intent, preparation, and plan." The court also found that testimony was "more probative than prejudicial."

¶7.     Betty also testified at the hearing. She said that when she was nine years old, her father took her into his bedroom and told her that her breasts were "not growing in." He then sat her on his lap and began rubbing her chest "underneath [her] clothes." He "pulled [her] up, so [she] could feel his thing rising pretty much." Mai told her not to tell her mother, but Betty eventually did tell Jenny that Mai "was touching on me." Three years later, Betty was using her mother's "Ab Rocket" exercise machine when her father came in and told her he would show her how to do a sit-up. When she did a sit-up, Mai rubbed "her belly trying to burn off fat. . . . [He] would slide his hand up to [her] breast every now and then"; so she quit and walked away. Mai also forced Betty to watch porn one time. Shortly thereafter, Betty became constipated and had "ripped her bottom using the bathroom." When she told her mother, her father came in and made her strip her pants off. Mai then "blew" some incense on her and "put his whole mouth on my private area and was sucking on it. And he tried to put his finger inside my vaginal [sic], and I got scared and jumped back." Betty also said Mai would brush up against her on occasion "and pinch a butt cheek or brush a thigh or put his whole groin on and rub up against me or like a brush-by," even after Betty was a married adult. When Betty would tell her mother, Jenny would just tell her not to talk about it and to put on more clothes. Defense counsel argued against the admission of this testimony at trial, asserting that the incidents were remote and that Betty had a motive "to lie, to

4

fabricate." The trial court ruled that Betty's "testimony [was] relevant under [Mississippi Rule of Evidence] 401 and under [Rule] 404(b) . . . and would go to show motive, opportunity, intent, preparation, and plan; and under [Rule] 403 . . . would be more probative than prejudicial." The trial court subsequently issued an order on April 25, 2022, granting the State's Rule 404(b) notice as to both Karen and Betty, with a limiting instruction to be given.

¶8. The trial was held April 25-26, 2022. Karen testified before the jury regarding the prior acts of sexually inappropriate behavior as related at her Rule 404(b) evidentiary hearing. *See supra* ¶5. She also testified about Mai's touching her on May 14, 2020. *See supra* ¶3. She did not immediately report the May 2020 incident because Mai "told [her] that if [she] were to tell anybody . . . he would go to jail and [her] mom would hate [her,] which would cause" her sister to hate her.

¶9. In August 2020, Karen said Mai "had threatened to shoot us like usual"; so "we called the cops." After the police left, Karen "finally told [Betty] what he did to me." Betty told her mother, who "was too drunk and too tired . . . [and] didn't want to talk about it." Betty reported the incident to the police a few days later. The police referred the case to "the CPS lady," and Karen had an interview with the Children's Advocacy Center (CAC). Although she related the recent incident, she did not tell the CAC interviewer "anything else because my mom had told me that morning that if I don't tell about all the past abuse, then she'll just leave him . . . and that we'll move on with our life together[.]" Karen testified that growing up, she "just saw a lot of violence," and "[i]t was a live-or-die situation."

5

¶10.    Betty testified that Karen and Khloe now lived with her and her husband. She noted that while she was growing up, their household was "very controlling," and her parents did not allow them to "have any friends." Betty testified to the prior instances when her father had touched her private area or had brushed against her or groped her. *See supra* ¶7. She also noted her mother began drinking during this time; "[s]o we didn't have anyone to watch over us."

¶11.    Betty mentioned an instance when she was a teenager, and her mother Jenny got upset at Mai because he had told Betty that there was no point in studying. Angry, Mai "pushed us into a room, threatened to tie us up in the ceiling and cut off our tendons so we would know and feel - - know everything that's going on but we can't run away from him." They escaped to the neighbors' house, and law enforcement was called. Jenny later blamed Betty, however, for calling the police and "would always tell [her] not to say anything, not to tell anything." When asked why she did not tell the police what Mai was doing, she stated that her parents "said that if we were to tell any adult or anyone and ask for help[,] they would look down on us and think that we're dirty and filthy and we wouldn't amount to anything."

¶12.    When Karen told Betty about the May 14, 2020 incident, Betty "lost it" and "wanted to shoot [her father]." She encouraged her mother to kick Mai out of the house the following day. Betty felt "so ashamed of what happened to us" that she and Karen wrote out statements because "she couldn't say it." A couple of months later, in October 2020, Betty noticed her mother withdrawing money from the family's business account[4]; so she moved her sisters in

---

[4] The family owned and operated a nail salon.

with her. Since that time, the family (their mother and brother) has "shunned" Betty and Karen.

¶13. Sergeant Joshua Hobock with the Flowood Police Department testified that he was called to the Mai residence on August 3, 2020. The reason for the call was that "a mother was threatening to harm herself, and the daughter at the house was attempting to remove all weapons at the time." After the situation "calm[ed] down," the officer talked with each family member. He learned that "the father . . . had sexually assaulted [Karen], and at that time [the mother] did not want them to call the authorities; and that was what the disturbance was about, that she didn't want it to be reported." Sergeant Hobock said Karen's demeanor was "upset and very, very animated, kind of what you would expect from someone who was upset." He "contacted CPS to have them come out on scene[.]" Sergeant Hobock did not interview Mai because he had left town since Jenny "had asked him to leave[.]"

¶14. The State rested, and the trial court denied the defense's motion for a directed verdict. The defense presented the testimony of five witnesses. Dorothy Moore, a former "[f]amily protection specialist" with the Department of Human Services, was shown a report from March 18, 2011, in which she had interviewed both Betty and Karen. She confirmed that her conclusion in the report was that there was no evidence of abuse. She acknowledged on cross-examination, however, that she had no recollection of the investigation. Mai's older brother from Michigan stated that when he visited the Mais, his nieces "looked really happy" and were "cheerful." Mai's son David claimed that he did not notice any inappropriate behavior from his father toward his sisters. If he had seen any such behavior, he "would have

7

either put him in jail or killed him myself." David acknowledged a text conversation between himself and Betty. He also admitted that the police had been to their house "[t]wo, maybe three times" for domestic calls before 2020. David said he did not believe his father molested his sisters.

¶15. Mai's wife Jenny testified that Mai did not abuse his daughters. She claimed that both she and her husband "love[d]" and "coddle[d]" their daughters. Jenny refuted Betty's claim that they were not allowed to have friends at their house. She also said Mai was "always by [her] side" the night she called the police on May 14, 2020. Jenny also denied being drunk. Jenny acknowledged on cross-examination that she married Mai when she was fourteen years old, and he was ten years older.

¶16. Mai, testifying on his own behalf, unequivocally denied that he took Karen into her bedroom and "molest[ed]" her on May 14, 2020. He averred, "She's my own flesh and blood . . . how could I possibly have done that?" When further questioned by the State about May 14th, Mai insisted that he and his wife "were always together." Mai admitted he had physically hit a family member in the past, not out of anger but "in terms of discipline." Discussing Betty's and Karen's allegations of prior sexual abuse, Mai insisted:

> I did hear about that, but I couldn't -- I couldn't possibly have done it. [Karen] is my blood. They are my blood and flesh . . . I love my children more than I love myself. How could I possibly have done that? . . . I just simply don't understand as to why now I am being wrongly accused.

When the State asked, "So both your daughters are liars," he replied, "That is correct, ma'am." Lastly, the State asked Mai, "What, if anything did [you] do to see if [Karen] was hurt" on May 14, 2020. Mai replied that he did not do anything "specific" and that

8

"[w]hatever that I wanted to do, I needed to talk to my wife."

¶17. The jury acquitted Mai of the sexual-battery charge,[5] but the jury found him guilty of fondling (gratification of lust). The trial court sentenced him to serve fifteen years in MDOC's custody. Mai filed a motion for a new trial, or in the alternative, for judgment notwithstanding the verdict, arguing that: the State failed to establish Mai "did anything to gratify his lust"; the Rule 404(b) evidence should not have been admitted as it was "highly prejudicial and untrustworthy" and "extremely confusing to the jury"; Karen's and Betty's testimonies should have been stricken as "not credible"; and Mai "was prejudiced by not being allowed to admit youth court records involving the same exact parties to this matter." The trial court denied the motion. Mai appeals, asserting related arguments that we now address.

## DISCUSSION

### I. Sufficiency of the Evidence

¶18. Mai contends that evidence was not sufficient to support the conviction as the State failed to meet the burden of proof as to the charge of fondling. When reviewing a challenge to the sufficiency of the evidence,

> this Court must decide whether the evidence allows a jury to find beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

---

[5] The trial court later granted the State's motion to nolle prosequi the sexual-battery charge without prejudice.

*Shead v. State*, 294 So. 3d 655, 663 (¶28) (Miss. Ct. App. 2020). Under section 97-5-23(2), a person is guilty of fondling of a child "for the purpose of gratifying his or her lust, or indulging his or her depraved licentious sexual desires" if he or she:

> shall handle[s], touch[es] or rub[s] with hands or any part of his or her body or any member thereof, any child younger than himself or herself and under the age of eighteen (18) years who is not such person's spouse, with or without the child's consent, when the person occupies a position of trust or authority over the child[.]

Mai specifically argues there was no evidence at trial that he had any "licentious sexual desire" when he checked to see if Karen had been injured by her boyfriend. Mai also notes the fact that he was fully clothed when the incident occurred and that he was the one who had called the police (to file charges against the man who had sex with Karen).

¶19. We have rejected a similar claim by a defendant charged with child molestation. *Foxworth v. State*, 982 So. 2d 453, 462 (¶34) (Miss. Ct. App. 2007). Like Mai, the defendant in *Foxworth* argued that the State had failed to prove the essential element of gratifying his lust. *Id*. at (¶33). We held that "touching in inappropriate parts of the child's body, . . . [and] events occurring when the child is not fully clothed, . . . might be sufficient to permit the jury to draw a reasonable inference as to the improper purpose of the defendant's act." *Id*. at (¶34) (quoting *Bradford v. State*, 736 So. 2d 464, 466 (¶9) (Miss. Ct. App. 1999)). We further concluded that the jury could reasonably infer "that [he] had an improper purpose in mind" from the evidence that (1) the defendant put his hand down the victim's shirt to touch her breast, and (2) his restraining her when she tried to get away. *Id*.

¶20. In this case, Karen testified that Mai "locked the [bedroom] door behind him" and

10

"pushed [her] down on the bed." Her father then touched her "higher thigh" after forcibly removing her pants, which made her "uncomfortable." When her mother knocked on the door, Mai told Karen to dress quickly because they would "get in trouble if she sees you like this." As in *Foxworth*, we find that a reasonable juror could infer from this testimony that Mai "had an improper purpose in mind" when he touched Karen.

¶21. The jury could additionally infer Mai's lustful intent from the evidence of his past inappropriate sexual behavior toward Karen and Betty. In *Anderson v. State*, 293 So. 3d 279, 292 (¶37) (Miss. Ct. App. 2019), this Court found no merit in the defendant's assertion that the State failed to prove the element "that he acted with lustful intent" for the charge of gratification of lust. We explained that the State had established "[t]he lustful intent element" by not only the victim's testimony "about [his] inappropriate touching" but also "the testimony of . . . witnesses regarding similar circumstances where [the defendant] touched them inappropriately." *Id*. at 292-93 (¶38).

¶22. In this case, Betty testified that on one occasion, after she began "developing a bit of a chest," her father "sat [her] on his legs" and she could "feel his erection on [her] butt." She also recalled an instance where Mai had "rub[bed] her belly" and "grope[d] the bottom of [her] chest" when she was working out at home. Karen likewise testified that when she was approximately eleven years old, Mai stayed home with her because she was sick. Despite her protest, Mai rubbed "Icy Hot" on her "chest, [her] breasts" in a "circular motion," which made her feel "scared." Karen also said Mai "tried to put his hands down [her] pants" when she was nine.

11

¶23. Viewing the evidence in the light most favorable to the prosecution, we find that the jury could infer from the evidence "that Mai touched [Karen] to gratify his lust."

## II. Jury Instruction D-9

¶24. The defense proposed Jury Instruction D-9, which stated:

The Court instructs the Jury that to the extent that you heard evidence of an alleged touching in this case, the touching does not in and of itself constitute a crime. In order to find the Defendant, LUAN TRONG MAI, guilty of the crime of unlawful touching for lustful purposes, the State must prove that the touching in this case was for the purpose of gratifying his or her lust, or indulging his or her depraved licentious desires.

The Court instructs you, the Jury, that the word "lust" means intense sexual desire or appetite, uncontrolled or illicit sexual desire, or a passionate or overmastering desire or craving for sex. The Court instructs you, the Jury, that the word "lewdness" means gross and wanton indecency in sexual relations so notorious as to tend to corrupt a community's morals.

The Court instructs you, the Jury, the word "lasciviousness" means to excite lust, lewd, indecent, obscene, sexual impurity, tending to deprave the morals in respect to sexual relations, licentious.

The Court instructs you, the Jury, that the word "gratifying" means giving or causing satisfaction, pleasing.

The State objected to the instruction, arguing that it was "not proper," as these "definitions are not provided anywhere in Mississippi caselaw." Defense counsel admitted that it was patterned after a federal jury instruction. The trial judge refused the instruction, noting, "Until we have a state case or until we've got something that's been approved by the appellate courts on what that definition is, I'll be honest with you, that's going to be a jury question. That's going to be up to them."

¶25. One of the elements of gratification of lust set forth in the jury instructions is "[f]or

12

the purpose of gratifying his lust or indulging in his depraved *licentious* sexual desires." (Emphasis added). Mai argues that the court's refusal of Jury Instruction D-9 was reversible error because "the jury was given no instruction or explanation of terms listed in the statute, which is greatly needed." To support his claim, Mai cites this Court's conclusion in *Nelson v. State*, 222 So. 3d 318, 325 (¶26) (Miss. Ct. App. 2017), that the trial court did not err *in giving* the State's jury instruction defining the term "'licentious' . . . in conjunction with the jury instruction regarding 'touching of a child for lustful purposes.'"

¶26. However, our holding in *Nelson* does not conversely mean that a trial court's refusal of a similar instruction would constitute reversible error. "This Court reviews the grant or denial of jury instructions for an abuse of discretion." *Dewitt v. State*, 269 So. 3d 388, 398 (¶35) (Miss. Ct. App. 2018) (quoting *Windless v. State*, 185 So. 3d 956, 960 (¶8) (Miss. 2015)). "A trial court in Mississippi can refuse a jury instruction if the instruction inaccurately states the law, is covered elsewhere in the instructions, 'or is without foundation in the evidence.'" *Id*. at 399 (¶35) (quoting *Taylor v. State*, 137 So. 3d 283, 286 (¶9) (Miss. 2014)). If the instructions, "[w]hen read together, . . . fairly announce the law of the case and create no injustice, no reversible error will be found." *Id*. at (¶37).

¶27. In *Blackwell v. State*, 915 So. 2d 453, 456 (¶9) (Miss. Ct. App. 2005), we "disagree[d]" with the appellant's argument "that the trial court's failure to instruct the jury on the statutory definition of sexually explicit conduct amounted to a failure to instruct the jury on an essential element of the crime" because the jurors were given three instructions "on all of the elements of the crime[.]" *See also Nichols v. State*, 27 So. 3d 433, 440 (¶22)

13

(Miss. Ct. App. 2009) (finding trial court had no duty to issue a sua sponte jury instruction defining "depraved-heart murder" when the jury instructions tracked the statutory language); *Smith v. State*, 237 Miss. 626, 630, 114 So. 2d 676, 677 (1959) (finding no error in the trial court's refusal of the defense's jury instruction defining "premeditation and malice").

¶28.    Here, the trial court gave Jury Instruction 7, which properly tracked the statutory language of section 97-5-23(2), permitting the jury to convict Mai if it found he "willfully, unlawfully, and intentionally handle[d], touch[ed], or rub[bed] [Karen] . . . [f]or the purpose of gratifying his lust or indulging in his depraved licentious sexual desires."[6]  Because the jury instructions as a whole fairly announced the law, we find no error in the trial court's refusal of Jury Instruction D-9.

### III.    Admissibility of Rule 404(b) Testimony

¶29.    After finding Karen's and Betty's testimonies at the pre-trial hearing "credible," the trial court entered an order granting the State's Rule 404(b) motion. The court determined that the victims' testimonies were "offered to prove a material issue other than character and [was] offered to show motive, opportunity, intent, preparation and plan," and the probative

---

[6] Section 97-5-23(2) provides (in relevant part):

> Any person above the age of eighteen (18) years, who, for the purpose of gratifying his or her lust, or indulging his or her depraved licentious sexual desires, shall handle, touch or rub with hands or any part of his or her body or any member thereof, any child younger than himself or herself and under the age of eighteen (18) years who is not such person's spouse, with or without the child's consent, when the person occupies a position of trust or authority over the child shall be guilty of a felony[.]

*Id*.

14

value "substantially outweigh[ed] any prejudice." Before the defense's case-in-chief, the trial court also gave a limiting instruction to the jury, stating:

> [T]he acts testified to by [Betty] are acts relating to charges for which the defendant is not presently on trial and are to be considered only for the limited purpose of showing proof of motive, opportunity, intent, preparation, and plan. You cannot and must not simply infer that the defendant acted in conformity with his previous acts and that he is therefore guilty of the charges for which he is presently on trial. The [c]ourt also instructs the jury that the acts testified to by [Karen] before or after May the 14th, 2020[,] are acts relating to charges for which the defendant is not presently on trial and are to be considered only for the limited purpose of showing proof of motive, opportunity, intent, preparation, and plan. You cannot and must not simply infer that the defendant acted in conformity with his previous acts and that he is therefore guilty of the charges for which he is presently on trial.

Mai argues that the trial court erred "in allowing [the] numerous allegations occurring years ago . . . with the alleged victim and her older sister at trial[.]" He claims these incidents were "totally unrelated" to the alleged incident in this case, and the allegations of prior "physical and mental abuse occurring" more than ten years ago was "not necessary for the [S]tate to prove its case . . . and should have been excluded."

¶30.    In *Gore v. State*, 37 So. 3d 1178, 1187 (¶20) (Miss. 2010), the Mississippi Supreme Court held that evidence of past allegations of sexual abuse, although remote, was admissible to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In *Gore*, the defendant John Gore was charged with "'gratifying his lust or indulging his depraved licentious sexual desires,' . . . by 'intentionally handling, touching[,] or rubbing, with his hands or any part of his body or any member thereof,' his twenty-one-month-old granddaughter[.]" *Id*. at 1180 (¶1). Gore's adult daughter was allowed to testify regarding his sexual molestation of her at the age of twelve,

approximately seven years before the alleged incident. *Id*. at 1183-84 (¶14) & n.17. Both Gore's adult son and daughter testified that he had required them to be naked at home and accompany him to a nudist camp. *Id*. at 1184 (¶14). The circuit court determined that the challenged testimony was permissible under Rule 404(b) and that the probative value of the evidence "was not 'substantially outweighed' by its prejudicial effect." *Id*. at 1187 (¶21). The court also provided a limiting instruction. *Id*. Upholding the trial court's ruling, the supreme court noted, "Where the competency of evidence is doubtful because of remoteness, the better practice is to admit the evidence, leaving it to the jury to determine its credibility and weight[.]" *Id*. at 1187 (¶19) (quoting *Ex parte Register*, 680 So. 2d 225, 228 (Ala. 1994)).

¶31. Likewise, in *Young v. State*, 106 So. 3d 775, 779-81 (¶¶17-18) (Miss. 2012), the supreme court affirmed the admissibility of evidence of sexual abuse the defendant had inflicted upon his half-sister twenty years prior to show the defendant's motive and "common plan" involving "taking advantage of family relationships to engage in sexual activities with prepubescent girls." In accordance with this precedent, we find no error in the trial court's ruling that these prior incidents of inappropriate touching with Karen and Betty were probative of Mai's plan because those incidents shared common features with the charge of fondling.

¶32. Mai also contends that the trial judge's failure to make a "detailed finding as to its reason for allowing this evidence" was reversible error. *See White v. State*, 228 So. 3d 893, 902 (¶22) (Miss. Ct. App. 2017) (noting the trial judge "failed to find under which permitted

use listed in Rule 404(b) the evidence would be admitted" but, instead, "merely cited the entirety of the Rule in its decision to admit the evidence").[7] After hearing Karen's testimony, the trial court made an on-the-record analysis, concluding:

> Based on what I have heard, the testimony I've heard today, I believe under 401 that it is relevant. Under 404(b) it would show as the State intends to prove motive or introduce it for the motive, opportunity, intent, preparation, and plan as listed in their notice. This is to show that, other than the defendant's character and conformity, also under 403 is more probative than prejudicial.

We find that this ruling properly identified the permitted uses under which the Rule 404(b) testimony was allowed. Regardless, a "trial court's failure to identify the specific applicable exception(s) under Rule 404(b) does not require reversal." *Masters v. State*, 285 So. 3d 192, 197 (¶17) (Miss. Ct. App. 2019) (quoting *Green v. State*, 89 So. 3d 543, 551 (¶17) (Miss. 2012)).

¶33. Mai further asserts that the prosecution's remarks during closing arguments referencing these prior events warrant a finding of reversible error. Specifically, regarding the daughters' interviews with law enforcement, the prosecutor commented, "They talk about how many times he molested them. He physically abused them. He molested them so many times it all runs together, ladies and gentlemen." Defense counsel objected, arguing, "It's a propensity issue." The trial court advised, "Let's move on," but made no ruling.

¶34. Mai contends that the trial judge erred by not sustaining the defense's objection to the

---

[7] In *White*, the trial court's failure "to make a detailed finding on the record explaining its decision to allow such evidence" was but one reason for finding that the court's decision to admit "the highly prejudicial and minimally probative nine-year-old, uncharged statutory rape evidence . . . [was] reversible error." *White*, 229 So. 3d at 902 (¶22).

State's remarks. However, Mai's attorney never sought a ruling by the trial court. In *Cole v. State*, 525 So. 2d 365 (Miss. 1987), the Mississippi Supreme Court addressed a similar scenario. *Id.* at 369. After the defense objected to the State's comment during voir dire that the potential jurors "could consider mercy in deciding the case," the trial judge, instead of ruling on the objection, merely said, "Move on." *Id.* We held that the defense's failure to "obtain a ruling from the trial court" waived the issue on appeal. *Id.* The supreme court has further held,

> It is well settled that to preserve an objection to alleged improper remarks by counsel during closing argument, the complaining party must not only make a contemporaneous and specific objection to the remarks, but must also obtain a definitive ruling from the trial court on his objection and must request corrective action.

*Rials v. Duckworth*, 822 So. 2d 283, 287 (¶22) (Miss. 2002). Therefore, we find this particular argument is waived. Waiver aside, the Mississippi Supreme Court has recognized that "a prosecutor can comment on facts in evidence, and he can draw proper deductions and inferences from the facts." *Clanton v. State*, 365 So. 3d 203, 215 (¶44) (Miss. 2023).

¶35. Accordingly, we find no reversible error and affirm Mai's conviction and sentence.

¶36. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. EMFINGER, J., NOT PARTICIPATING.**